1

2

3

4

5

6                        IN THE UNITED STATES DISTRICT COURT

7                              FOR THE DISTRICT OF ARIZONA

8

9    Sergei Lawrikow,                    )    No. CV-08-1403-PHX-GMS (LOA)
                                         )
10                    Petitioner,        )    **AMENDED REPORT AND**
                                         )    **RECOMMENDATION**
11   vs.                                 )
                                         )
12   David Kollus,                       )
                                         )
13                    Respondent.        )
                                         )
14   _____ )

15          Petitioner, Sergei Lawrikow, has filed a Petition for Writ of Habeas Corpus

16   pursuant to 28 U.S.C. § 2241, claiming that his indefinite detention pending removal is

17   not authorized by federal law.  (docket # 1)  Respondents filed an Answer[1] to which

18   Petitioner replied.  (dockets # 12, # 17, respectively)  On May 15, 2009, the undersigned

19

20          [1]  Before filing an Answer, Respondent filed a motion to hold the proceedings in
     abeyance to permit Petitioner the opportunity to request a bond hearing in accordance with
21   *Casas-Castrillon v. DHS*, 535 F.3d 942, 948 (9th Cir. 2008) and *Prieto-Romero v. Clark*, 534
     F.3d 1053,1062 (9th Cir. 2008).  (docket # 8)  The Court denied the motion to stay, and
22   directed Respondent to file an Answer which included a discussion the application of *Casas-*
     *Castrillon* and *Prieto-Romero* to Petitioner's claims.  (docket # 9)  Despite the Court's order,
23   and the fact that Respondent first raised the issue, Respondent does not discuss *Casas-*
     *Castrillon* and *Prieto-Romero* in the Answer.  Presumably, Respondent did not further
24   address those cases because they do not apply to Petitioner's case which is in a different
     procedural posture — namely, Petitioner's removal order is final and not awaiting judicial
25   review.  *See Prieto-Romero*, 534 F.3d at 1062 (holding that detention of aliens *awaiting*
     *judicial review* of their removal orders is governed by 18  U.S.C. § 1226(a)); *Casas-*
26   *Castrillon*, 553 F.3d at 948 (hold that § 1226(a) requires the Attorney General to provide an
     alien awaiting judicial review of his removal order with a bond hearing).
27

28

issued a Report and Recommendation, recommending that the Petition be granted. (docket # 18)  Thereafter, Respondent filed objections presenting new evidence to the Court.  (docket # 23)  The Honorable G. Murray Snow exercised the Court's discretion to accept the new evidence, *see Brown v. Roe*, 279 F.3d 742, 744 (9th Cir. 2002), and referred this matter to the undersigned for further consideration.  (docket # 24)

On Petitioner's motion, the undersigned granted Petitioner an extension of time to respond to Respondent's Objections.  Petitioner filed a Reply to the Objections, docket # 27, and a separate Motion for Preliminary Injunction, docket # 28.  The Court directed Respondent to respond to the Motion for Preliminary Injunction and provide an update regarding the Government's removal efforts.  Respondent submitted the requested briefing on July 17, 2009.  (docket # 30)  Accordingly, this matter is ready for review.  Because consideration of the request for injunctive relief necessitates consideration of the underlying merits of the Petition, the Court will consider the merits of the Petition for Writ of Habeas Corpus and Petitioner's motion for injunctive relief simultaneously.

To avoid confusion, and in view of the new evidence which impacts the analysis of the Petition, the undersigned vacates the May 15, 2009 Report and Recommendation and issues this Amended Report and Recommendation.

## I.  Factual and Procedural Background

Petitioner, who was born in the former Soviet Union, entered the United States on July 9, 1991 on a K-1, fiancé, visa not to exceed 90 days.  (Respondent's Exh. 1[2])

On October 19, 1993, the former Immigration and Naturalization Service ("INS") filed an Order to Show Cause ("OSC"), charging Petitioner with removability under Immigration and Nationality Act ("INA") § 241(a)(1)(B) for having remained in the

---

[2]    Unless otherwise indicated, citations to "Respondent's Exh.___", are to Respondent's exhibits 1-14 attached to docket # 12, and to exhibits 15 and 16 attached to docket # 30.  Respondent also submitted lightened copies of exhibits 1, 2, and 3 attached to docket # 14.

United States for a time longer than permitted after admission as a non-immigrant under INA § 101(a)(15). (Respondent's Exh. 2) The OSC charged that: Petitioner entered the United States on a non-immigrant K-1 fiancé visa with authorization to remain in the United States for no more than 90 days; Petitioner did not marry the intended United States citizen; and he failed to depart within the time specified. (Respondent's Exh. 2)

On March 27, 1995, Petitioner appeared *pro se* before the immigration court. Petitioner admitted the allegations and conceded the charge of removability. (Respondent's Exh. 3) The Immigration Judge ("IJ") denied Petitioner's requests for asylum, withholding of removal, and withholding/deferral of removal under article 3 of the Convention Against Torture. (Respondent's Exh. 3) The IJ granted Petitioner voluntary departure until April 27, 1995. The IJ alternatively ordered Petitioner deported to Russia if he failed to voluntarily depart by April 27, 1995. Petitioner reserved appeal and sought review in the Board of Immigration Appeals ("BIA"). (Respondent's Exhs. 3, 5)

On appeal, Petitioner argued, *inter alia*, that he had not understood the proceedings before the immigration court because the IJ denied his request for an interpreter. On December 27, 2000, the BIA sustained Petitioner's appeal based on the denial of a Russian interpreter. (Respondent's Exh. 5)

Thereafter, Petitioner was scheduled to appear before the Immigration Court on January 23, 2001 to consider his request for relief from deportation. (Respondent's Exh. 6) Petitioner failed to appear, and the IJ issued an *in absentia* order that Petitioner be deported to Russia. (Respondent's Exh. 6) On February 6, 2001, the Government filed a motion to re-open the immigration proceedings because the notice of the January 23, 2001 hearing was not sent to Petitioner's current address. (Respondent's Exh. 8) On February 8, 2001, the IJ granted the motion, reopened the immigration proceedings, and scheduled a hearing for May 22, 2001. (Respondent's Exh. 9) On May 22, 2001, the IJ

again issued an *in absentia* order of deportation to Russia after Petitioner failed to appear in court. (Respondent's Exh. 10)  Petitioner did not appeal that decision to the BIA.

Several months later, on September 28, 2001, Petitioner was convicted in the Superior Court of Arizona, Maricopa County, of aggravated assault, a class 3 felony, in violation of A.R.S. § 13-1204(A)(2), 13-1204(B), 1203(A)(2), 701, 702, 801, and 13-604(P).  Petitioner was sentenced to seven-and-a-half years imprisonment with credit for 134 days served prior to sentencing. (Respondent's Exh. 7)

After serving his sentence, on or about October 20, 2007, the Arizona Department of Corrections transferred Petitioner to the custody of Immigrations and Customs Enforcement ("ICE") and he was immediately transferred to the Florence Detention Center. (Respondent's Exh.11, docket # 23-3, ¶ 7)  Notes on the I-213 Form reflect that "counsel Hoya will re-open [Petitioner's removal proceedings] since the removal order was in absentia since [Petitioner] was in custody with another agency." (Respondent's Exh. 11)  The I-213 Form also notes that Petitioner was ordered removed *in absentia* on May 22, 2001. (Respondent's Exh. 11)  There is no indication that Petitioner's removal proceedings were reopened.  On October 31, 2007, the Government notified Petitioner that his detention would be reviewed. (Respondent's Exh. 13)  On February 26, 2008, the Government conducted a Post Order Custody Review.  On March 11, 2008, the Government decided to continue Petitioner's detention. (Respondent's Exh. 14)

In the meantime, on October 31, 2007, Petitioner signed an "Instruction Sheet to Detainee Regarding Requirement to Assist in Removal" thereby agreeing to assist in obtaining a travel document. (Respondent's Exh. 13)  On November 6, 2007, ICE officers sent a request to ICE Headquarters asking for assistance in obtaining a return document for Petitioner. (Respondent's Exhs. 12, 14, docket # 23-3 at ¶8)

On February 26, 2008, ICE prepared a travel document request for Petitioner.  On February 29, 2008, Petitioner completed a Russian Travel Document request form in Russian, and the entire packet was forwarded to the General Consul of Russia.

(Respondent's Exh. 12) An English translation of this form, produced to the Court on June 5, 2009, indicates that Petitioner included the following statement on the February 29, 2008 form, "I am filing out this paper under duress and at this time I do not wish to voluntarily return." (docket # 23-3, ¶ 9; docket # 23-3 at p. 10)

On April 23, 2008, a second request for issuance of a travel document was sent to the Russian Consulate in San Francisco, California. (docket # 23-3, ¶ 10) On April 24, 2008, a follow-up call was placed to the Russian Consulate, a message was left but the call was not returned. (docket # 23-3, ¶11) On June 4, 2008, another follow-up call was placed to the Russian Consulate, a message was left but the call was not returned. (docket # 23-3, ¶ 12) On April 24 and June 13, 2008, follow-up requests were made to Yuriy Mikhaylov at the Headquarters Travel Document Unit. (docket # 23-3 at ¶¶11, 13)[3]

In late July, early August 2008, ICE recommended that Petitioner be released on a monitoring bracelet and began preparing for his release. (Respondent's Exh. 14, ¶ 12) Pursuant to "victim/witness protocol," the Government notified the Phoenix Police Department and Petitioner's ex-wife (victim) of Petitioner's pending release. (Respondent's Exh. 14, ¶ 10) On August 7, 2008, the Phoenix Police Department notified the Government that Petitioner had made threats and attempted to arrange to kill a Phoenix Police Officer and threatened to kill Petitioner's ex-wife. (Respondent's Exh. 14, ¶¶10, 11) Based on that information, ICE reconsidered its decision to release Petitioner, and on September 2, 2008, ordered that Petitioner's detention be continued. (Respondent's Exh. 14, ¶ 12, attachment A)

On October 6, 2008, Deportation Officer Shane Carlson was advised that the Russian Consulate was prepared to issue a travel document if Petitioner completed an

---

[3] Information regarding ICE's removal efforts from April 23, 2008 to June 13, 2008 discussed in the Declaration of Deportation Officer Reynaldo Mendoza was not provided to the Court until June 5, 2009. (docket # 23) Mendoza assumed assigned Petitioner's case from Deportation Officer Shane Carlson on November 3, 2008. (docket # 23-3 ¶ 5)

interview with an official from the Russian Consulate. (Respondent's Exh. 14, ¶ 14) The Russian Consulate will not issue a travel document unless the alien states in an interview that he agrees to return to Russia. (Respondent's Exh. 14, ¶ 14) On October 8, 2008, Michael Koransky from ICE's Headquarters Travel Document Unit sent the Russian Consulate in San Francisco a request that "the consulate travel to Florence, Arizona to interview Lawrikow and accept a new travel document application." (docket # 23-3, ¶ 14)

On October 15, 2008, a telephonic interview was conducted between Petitioner and Russian Federation Vice Consul, Alexi Dobrinsky. (Respondent's Exh. 14, ¶ 15; docket # 23-2, Declaration of Shane Carlson dated June 5, 2009 at ¶ 6) In his Declaration dated October 27, 2008, Shane Carlson states that during the October 15, 2008 interview, Petitioner "*stated that he did not desire to return to Russia.* Based on that statement, Mr. Dobrinsky stated that the Russian Consulate would not issue a trave document to Lawrikow." (Respondents' Exh. 14, ¶ 15) (emphasis added) Carlson's October 27, 2008 Declaration further states that, "[a] second telephone interview was scheduled for October 24, 2008, to see if Lawrikow will state *he is willing to return to Russia*." (Respondents' Exh. 14, ¶ 15) (emphasis added)

After the undersigned issued the May 15, 2009 Report and Recommendation, finding the Petitioner had cooperated with removal efforts, and recommending that the Petition be granted, on June 5, 2009, Deportation Officer Shane Carlson prepared another Declaration which Respondent submitted in support of the objections to the Report and Recommendation. (docket # 23-2 - June 5, 2009 Carlson Decl.) In his June 5, 2009 Declaration, Shane Carlson changes the description of the October 15, 2008 telephonic interview between Petitioner and Mr. Dobrinsky. Carlson now states that:

> 5. On October 15, 2008, I contacted Alexi Dobrinsky . . . at the Russian Consulate regarding a travel document for Lawrikow. Mr. Dobrinsky stated that he would like to interview Lawrikow by telephone before traveling to Florence Detention Center to issue a travel document because if Lawrikow 'was not willing' to sign a travel document then traveling to Florence would

serve no purpose. The purpose of the interview was to determine if Lawrikow would comply and sign the travel document when it was issued. I arranged for the interview to take place by telephone later that same day.

> 6. On October 15, 2008, an interview was conducted *via* phone between Mr. Lawrikow and . . . Mr. Dobrinsky. I was present during the interview and the interview was conducted by Mr. Dobrinsky and Mr. Lawrikow *in Russian.* After the interview concluded, Mr. Dobrinsky told me that Lawrikow stated during the interview that he did not desire to return to Russia *and that he would not sign the travel document when it was issued.* Based on that statement, Mr. Dobrinsky stated that the Russian Consulate would not issue a travel document to Lawrikow. A second telephone interview was scheduled for October 24, 2008 to see if Lawrikow would state *that he would sign a travel document if issued* and whether he was willing to return to Russia.

(docket # 23-2, June 5, 2009 Carlson Decl., ¶ 6) (emphasis added)

On October 24, 2008, another telephonic interview was conducted between

Petitioner and Mr. Dobrinsky with the Russian Consulate. (Respondents' Exh. 14, ¶ 16;

docket # 23-2, ¶ 7)   In his October 27, 2008 Declaration, Shane Carlson states that,

"during this interview, Mr. Lawrikow stated that *he did not desire to return to Russia.*

Again, Mr. Dobrinsky stated that the Russian Consulate would not issue a travel

document to Lawrikow." (Respondents' Exh. 14, ¶ 16) (emphasis added)

In his June 5, 2009 Declaration, Carlson modifies his description of the October

24, 2008 telephonic interview. (docket # 23-2)  To show the contrast between Carlson's

October 27, 2008 Declaration and his June 5, 2009 Declaration, the Court has italicized

the new information. Carlson now states that:

> On October 24, 2008, another interview was conducted via phone between Mr. Lawrikow and Mr. Dobrinsky. *Again, I was present during [the] interview and the interview was conducted on speaker phone in English.* Again, the purpose of the interview was to determine if Lawrikow would comply and *sign the travel document when it was issued.* Again during this interview, Mr. Lawrikow stated that he did not desire to return to Russia *and that he would not sign the travel document when it was issued.* Again, Mr. Dobrinsky stated that the Russian Consulate would not issue a travel document to Lawrikow.
>
> *During the October 24, 2008 interview, Lawrikow did not tell Mr. Dobrinsky that he was willing to return to Russia even if he did not desire to return.*

(docket # 23-2 - June 5, 2009 Carlson Decl., ¶ 7, 8) (emphasis added).

A July 15, 2009 Declaration of Deportation Officer Kevin Kopiasz, who assumed Petitioner's case on July 6, 2009, states that DHS "attempted to make a video recording of the [October 24, 2008 telephonic] interview.  However, the Department's equipment malfunctioned resulting in a defective video tape recording."  (docket # 30, Exh. 15 - Declaration of Kevin Kopiasz ["Kopiasz Decl."], ¶ 5)

On October 27, 2008, Petitioner was issued a "Notice of Failure to Comply" and another "Instruction Sheet to Detainee Regarding Requirement to Assist in Removal." (Respondent's Exh. 14, ¶ 17 - attachment B)   Petitioner did not sign the Instruction Sheet. (Respondents' Exh. 14, attachment B)   On November 3, 2008, Deportation Officer Reynaldo Mendoza assumed Petitioner's case from his prior case officer, Shane Carlson. (docket # 23-3 - June 5, 2009 Declaration of Reynaldo Mendoza ("Mendoza Decl."), ¶ 5)

On December 2, 2008, January 8, 2009, February 3, 2009, and March 4, 2009, Petitioner was served with form I-229a, Warning for Failure to Depart.  (docket # 23-3, Mendoza Decl. ¶¶ 17-20)  On April 3, 2009, Petitioner was again served form I-229a, Warning for Failure to Depart, and a second Notice of Failure to Comply.  (docket # 23-3, Mendoza Decl. ¶ 21)

On May 28, 2009, Assistant Supervisory Detention and Deportation Officer Daniel Fulton spoke with Russian Consul General, Mr. Dobrinsky, by telephone, and Mr. Dobrinsky agreed to consider a new request for a travel documents  (*Id*. at ¶¶ 16, 22)  Thereafter, Fulton submitted a letter and supporting documentation to Mr. Dobrinsky's office in San Francisco, California, requesting a travel document be issued for Petitioner. Included in the documents was Petitioner's December 2, 2008 Affidavit previously submitted in this case.  (docket # 23-3, Mendoza Decl. ¶ 22; docket # 17 - attachment)   In his December 2, 2008 Affidavit, Petitioner states that he does "not wish to go back to Russia," but he "will comply with any order [of] removal to Russia if the Russian Consulate issues the appropriate travel documents."  (docket # 17, attachment)

On June 1, 2009, Petitioner completed another travel document request which was forwarded as part of the new travel document request sent to the Russian Consulate in San Francisco. (*Id.* at ¶ 23; docket 23-3 at 5, 6) On June 4, 2009, Deportation Officer Mendoza telephoned Mr. Dobrinsky and left a message inquiring about Petitioner's travel document request. (docket # 23-3, Mendoza Affidavit ¶ 24)

On June 9, 2009, ICE officials from the Travel Department Unit ("TDU") met personally with officials at the Russian Embassy in Washington, D.C. to follow-up on Petitioner's travel document request. (docket # 30, Exhibit 16 - Declaration of Vicente B. Carlos[4] ("Carlos Decl."), ¶ 8) "The Embassy stated that they do not have jurisdiction over travel document requests from the State of Arizona, but . . . it appeared the case is still pending verification of Russian Federation citizenship." (*Id.*)

On June 15, 2009, the Government received a letter from Vice Consul Dobrinsky responding to the June 2, 2009 travel document request. (Respondent's Exh. 15 - Kopiasz Decl. ¶ 7) In the letter, Vice Consul Dobrinsky stated that the consulate would issue a travel document for a Russian citizen only upon written request. (docket # 30, Exh. 15 - Kopiasz Decl. ¶ 7)

On July 7, 2009, ICE officials from the Travel Department Unit ("TDU") met personally with officials at the Russian Embassy to discuss "future relations" and "issues surrounding [travel document] requests." Petitioner's case was discussed at that meeting. (docket # 30, Exh. 16 - Carlos Decl., ¶ ¶ 8, 9) At that meeting, "Embassy Officials stated that [Petitioner's] case is being handled by the Consulate General in San Francisco and is pending verification of Russian citizenship." (*Id.* at ¶ 9)

On July 14, 2009, the Russian Vice Consul contacted Deportation Officer Kopiasz by telephone and stated that Petitioner needed to complete and sign "a specific travel

---

[4] Vicente Carlos is a Detention and Deportation Officer with ICE's Travel Document Unit ("TDU") in Washington, D.C. (docket # 30, Exhibit 16 - Declaration of Vicente B. Carlos)

document request form" which the Vice Consul sent *via* e-mail. (docket # 30, Exh. 15 - Kopiasz Decl. ¶ 8)  On July 15, 2009, Petitioner completed and signed the specific travel document request form.  That same day, Deportation Officer Kopiasz sent the signed travel document request to Vice Consul Dobrinsky by e-mail and sent the original to the Russian Consulate *via* Federal Express.  Vice Consul Dobrinsky has not provided a specific time frame for issuing a travel document.  (docket # 30, Exh. 15 - Kopiasz Decl. ¶ 9)

On July 15, 2009, ICE officials in the Travel Department Unit again contacted the Russian Federation Embassy in Washington, D.C. for an update on Petitioner's case.  The Russian Federation Embassy explained that verifying citizenship for citizens holding birth certificates and passports from the former USSR, such as Petitioner, is "difficult and time consuming." (docket # 30, Exh. 16 - Carlos Decl. ¶ 10)

**II.  Analysis**

Petitioner argues that his continued detention following the issuance of a final removal order is not authorized by law.[5]  Respondent contends that because Petitioner has at times impeded the Government's efforts to effectuate his removal, he is not entitled to relief under *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  (docket # 12)  Respondent further argues that Petitioner's removal will likely be effectuated in the reasonably foreseeable future because a new travel document request was submitted in June, 2009 and is being considered by the Russian Consulate.  (dockets # 23, # 30)

---

[5] Petitioner also argues that his detention violates *Tijani v. Willis*, 430 U.S. 1241 (9th Cir. 2005) and *Demore v. Kim*, 538 U.S. 510 (2003).  (docket # 1) As Respondent argues, these cases do not apply. (docket # 12)  *Tijani* and *Demore* analyzed detention under 8 U.S.C. § 1226(c) during removal proceedings when subject to a stay of removal.  In this case, Petitioner's removal order is final and he is detained under 8 U.S.C. § 1231(a)(6).  Thus, *Demore* and *Tijan*i do not apply.

## A. Governing Statutes

Several statutes provide for the detention of aliens under different circumstances. Section 236(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226, governs the initial apprehension and detention of aliens for purposes of determining whether an alien should be removed from the United States. 8 U.S.C. § 1226. Section 1226(c) provides that, except in limited circumstances, aliens convicted of qualifying crimes must be detained pending removal proceedings. *Id*. Petitioner's initial detention was governed by § 1226(c).

After the completion of removal proceedings, the detention, release and removal of an alien who has been ordered removed is governed by 8 U.S.C. § 1231(a). *Zadvydas v. Davis*, 533 U.S. 678, 683 (2001) (referring to § 1231 as the "post-removal-period detention statute."). Section 1231(a)(2) authorizes the detention of the alien during the 90-day removal period established in § 1231(a)(1). "[T]he removal period begins on the latest of the following: (i) The date the order of removal becomes administratively final. (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order. (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from custody or confinement."). 8 U.S.C. § 1231(a)(1)(B). Section 1231(a)(6) grants the Attorney General the discretionary authority to detain certain classes of aliens "beyond" the 90-day removal period, or to release them subject to terms of supervision in § 1231(a)(3).

In *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001), the Supreme Court held that the period during which an alien may be detained under the post-removal-period detention provision, 8 U.S.C. § 1231(a)(6), is limited to a "period reasonably necessary to bring about that alien's removal" and does not permit indefinite detention. *Id.* at 689, 701. Because the Due Process Clause applies to aliens who have entered the United States, the Court found that a "statute permitting indefinite detention of an alien would raise a

serious constitutional problem." *Id.* at 690. The Supreme Court presumes that six months is a reasonable amount of time to effectuate removal. *Id.* at 701. However, the six-month presumptive period does not mean that every alien not removed must be released after six months. Rather, the *Zadvydas* Court established a burden-shifting analysis that applies in determining whether a period of post-removal-order detention in excess of six months is permissible. First, the alien must provide "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701. If the alien meets this burden, "the Government must respond with evidence sufficient to rebut that showing." *Id.* "[F]or detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.* at 701.

*Zadvydas* did not disturb an alien's statutory duty to affirmatively assist the Government in obtaining travel documents. Section 243(a)(1)(B) of the INA, codified at 8 U.S.C. § 1253(a)(1)(B), provides that an alien subject to a final order of removal who "willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure" is subject to criminal fines and/or imprisonment of up to four years. *Id.* Additionally, 8 U.S.C. § 1231(a)(1)(C) provides that the 90-day "removal period shall be extended . . . and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure . . . ." *Id.* Mindful of the foregoing, the Court will consider Petitioner's claim.

**B. Application of *Zadvydas* to Petitioner's Claims**

In this case, the ninety-day removal period did not commence until the date Petitioner was released from custody of the ADOC. *See* 8 U.S.C. § 1231(a)(1)(B) (stating that "the removal period begins on the latest of the following: (i) The date the order of removal becomes administratively final. (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

- 12 -

1  (iii) If the alien is detained or confined (except under an immigration process), the date

2  the alien is released from custody or confinement.")  Accordingly, the removal period

3  commenced on or about October 20, 2007, when Petitioner was released from the ADOC

4  and returned to DHS custody. (Respondent's Exh. 11)  Thus, the 90-day statutory

5  removal period expired on or about January 20, 2008 and the presumptive 6-month period

6  expired in July of 2008.  Since the expiration of the 90-day removal period, Petitioner has

7  spent over 18 months in custody awaiting removal, over three times the six-month period

8  that the Supreme Court considered presumptively reasonable in *Zadvydas*.  *Zadvydas*, 533

9  U.S. at 701.

10      Petitioner asserts that he has cooperated with the Government's attempts to remove

11  him, but the Russian Federation government has refused to issue Petitioner a travel

12  document based on his lack of desire to return to Russia.  Petitioner maintains that,

13  although he does not desire to go to Russia, he is willing to complete a travel document

14  and is willing to return to Russia.  (dockets # 17, # 27)

15      Respondent asserts that because Petitioner has not consistently cooperated with

16  removal efforts, he is not entitled to relief under *Zadvydas* and his continued detention is

17  lawful. (dockets # 12, # 23, # 30); *See Lema v. INS*, 341 F.3d 853, 855 (9th Cir. 2003)

18  (holding that "when an alien refuses to cooperate fully and honestly with officials to

19  secure travel documents from a former government, the alien cannot meet his or her

20  burden to show there is no significant likelihood of removal in the reasonably foreseeable

21  future.")

22      In this situation, the Court reviews the record to determine whether the factual

23  findings of ICE are supported by substantial evidence.  *Tobon v. Gonzales,* No CV-07-

24  1731-PHX-JWS (GEE), 2008 WL 56105, at * 2 (D.Ariz., Feb. 28, 2008) (citing *Lema v.*

25  *INS*, 341 F.3d 853, 855 (9th Cir. 2003); *Arrington v. Daniels*, ___ F.3d ___, 2008 WL

26  441835 (9th Cir. 2008) (stating that "[i]n conducting our review, we may look only to the

27

28                                        - 13 -

administrative record to determine whether the agency has articulated a rational basis for its decision.")).

The record contains only one document from ICE documenting Petitioner's failure to cooperate. Specifically, on October 27, 2008, ICE served Petitioner with a "Notice of Failure to Comply Pursuant to 8 C.F.R. § 214.4(g)." (Respondents' Exh. 14, attachment B) That notice simply states that "[a]s you have failed to provide the necessary information needed to obtain a travel document, you have failed to comply with your obligation and are acting to prevent your removal from the United States. The removal period is therefore extended in this case." (*Id*.) The October 27, 2008 notice does not identify the information which Petitioner failed to provide or otherwise describe Petitioner's lack of cooperation. (*Id*.)

The June 5, 2009 Declaration of Deportation Officer Mendoza states that on "April 3, 2009, I served Lawrikow with a second failure to comply letter." (docket # 23-3, ¶ 21) The Court, however, cannot review the contents of the alleged April 3, 2009 "failure to comply letter," because Respondent has not provided a copy of that letter to the Court.

The record does not contain substantial evidence in support of ICE's finding that Petitioner failed to cooperate in the October 27, 2008 "Notice of Failure to Comply Pursuant to 8 C.F.R. § 214.4(g). *See Lema*, 341 F.3d at 855. Rather, the record contains evidence that Petitioner has cooperated with the Government and, at most, contains conflicting information suggesting that Petitioner may not have fully cooperated during two telephonic interviews with the Russian Vice Consul in the fall of 2008.

The record contains the following evidence. On October 31, 2007, Petitioner signed a form entitled "Instruction Sheet to Detainee Regarding Requirement to Assist in Removal," agreeing to do the following: submit his passport to ICE; apply for a travel document; comply will all instructions related to obtaining a travel document; submit his birth certificate to ICE; provide names of family members and friends residing in the United States; take measures to reinstate his former nationality or take other action to

ensure issuance of a travel document; provide ICE with copies of travel document requests submitted to embassies or consulates; and solicit permission from another country to enter that country to effect his removal. (Respondent's Exh. 14, attachment B) In compliance with the October 31, 2007 "Instruction Sheet," on February 29, 2008, Petitioner provided ICE with relevant information and documents, and completed a Russian Travel Document Request form in Russian. (Respondent's Exh. 12)[6]

The Russian Consulate subsequently indicated that it would not issue a travel document to Petitioner unless he stated in an interview that he was willing to return to Russia. (Respondents' Exh. 14, ¶ 14) Accordingly, in October of 2008, two telephonic interviews took place between Petitioner and Russian Vice Consul Dobrinsky. The record contains conflicting evidence regarding Petitioner's statements during those interviews. In an October 27, 2008 Declaration, Deportation Officer Shane Carlson indicated that Petitioner had told Dobrinsky during both interviews that "he did not desire to return to Russia," and that based on that statement, Dobrinsky refused to issue a travel document for Petitioner. (Respondents' Exh. 14, ¶ 15) After the Court issued a Report and Recommendation, finding that Petitioner's expression of a lack of desire to return to Russia did not support a finding that Petitioner has failed to cooperate with removal

---

[6] Respondent recently submitted an English translation of the February 29, 2008 form on which Petitioner wrote, "I am filing out this paper under duress and at this time I do not wish to voluntary return." (docket # 23-3 at 10-11) Respondent does not mention this statement in the body of its argument in support of its objections to the Report and Recommendation. (docket # 23) Rather, the English translation of the February 29, 2008 travel document request is merely attached as an exhibit to the Mendoza Declaration. (docket # 23-3) Respondent must not consider Petitioner's statement on the February 29, 2008 travel document request significant, because the statement has never been specifically brought to the Court's attention and was only made part of the record on June 5, 2009 when Respondent filed Objections to the Report and Recommendation. (docket # 23) Moreover, Petitioner's statement that he did not wish to voluntarily return to Russia was a truthful statement expressing Petitioner's lack of desire to return.

efforts, Respondent submitted a June 5, 2009 declaration of Shane Carlson which added to the description of the October 15 and 24, 2008 telephonic interviews. (docket # 23-2)

Carlson now states that he was present during the October 15, 2008 telephonic interview between Petitioner and Mr. Dobrinsky which was conducted in Russian (docket # 23-2, ¶ 6). Carlson further states that, after the interview, "Mr. Dobrinsky told [him] that Lawrikow stated during the interview that he did not desire to return to Russia and that he would not sign the travel document when it was issued." (docket # 23-2, ¶ 6)

Carlson's June 5, 2009 Declaration states that the October 24, 2008 telephonic interview between the same parties was "conducted on speaker phone in English." (docket # 23-2 ¶ 8) The June 5, 2009 Declaration further states that, during the October 24, 2008 interview, Petitioner stated that he "did not desire to return to Russia and that he would not sign the travel document when it was issued." (docket # 23-2, ¶ 7)

Deportation Officer Kopiasz, who was not assigned to Petitioner's case at the time of the October 2008 interviews, states that ICE attempted to video record the October 24, 2008 telephonic interview, but that the equipment malfunctioned. (Respondents' Exh. 15, ¶ 5) Neither Respondent nor Petitioner has produced a transcript or audio recording of either the October 15 or October 24, 2008 interviews.

Respondent argues that Petitioner did not cooperate in good faith during the October 15 and October 24, 2008 telephonic interviews, because during both interviews he stated that he would not sign a travel document and did not express a willingness or a desire to return to Russia. Petitioner disputes this characterization of the October 2008 interviews.

The foregoing evidence cited by Respondent does not constitute substantial evidence of Petitioner's failure to cooperate in view of the other evidence in the record. The changes to Shane Carlson's declaration, made after the undersigned issued a finding that Petitioner had cooperated, are curious. The changes to the Carlson declaration bear directly on the issue of whether Petitioner had merely expressed a lack of desire to return

to Russia, or whether he had actively refused to cooperate by stating that he would not complete travel documents if issued by the Russian Consulate. The October 27, 2008 Carlson declaration contained statements supporting a finding that Petitioner had only expressed a lack of desire to return to Russia. The June 5, 2009 Carlson Declaration, added new information, indicating that Petitioner had also expressed an unwillingness to complete a travel document. This new information, if true, supports a finding that Petitioner failed to cooperate with removal efforts, at least during the October 2008 telephonic interviews.

The Court, however, need not resolve the differences between the Carlson Declarations or the cooperation issue. Even assuming Petitioner failed to cooperate with removal efforts for a short period of time, the record indicates that he has otherwise cooperated. Indeed, even if Petitioner did express an unwillingness to complete travel documents issued by the Russian government during the October 2008 interviews, in his December 2, 2008 affidavit, Petitioner clearly states that he is willing to comply with any removal orders and will comply with travel documents provided by the Russian Consulate. (docket # 17, attachment) Respondent submitted a copy of the December 2, 2008 affidavit in support of a June 2, 2009 travel document request that is pending before the Russian Consulate. Respondent does not explain why ICE waited until June 2, 2009 to submit a new travel document request for Petitioner based on his December 2, 2008 affidavit.

Petitioner has been detained for over 18 months after the expiration of the 90-day removal period. Assuming Petitioner failed to cooperate from October 2008 until December 2, 2008 and, thus excluding two months from the due process protections afforded by *Zadvydas*, *see Pelich v. INS*, 329 F.3d 1057 (9th Cir. 2003) (holding that indefinite detention did not violate due process where alien's detention was indefinite only because he refused to cooperate with INS to remove him), Respondent is still responsible for detaining Petitioner for approximately 16months. Thus, the length of

Petitioner's detention extends well beyond the six months presumed to be a reasonable amount of time to effectuate removal.

To state a claim under *Zadvydas*, Petitioner not only must show post-removal-order detention in excess of six months, which Petitioner has shown, but he also must provide evidence of a good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future. *Zadvydas*, 533 U.S. at 701.

Thus, the burden is on Petitioner to provide good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future. *Id.* Petitioner satisfies this burden. The record reflects that the Government made no effort to obtain a travel document for Petitioner from October 24, 2008 until May 28, 2009. (docket # 23, docket # 23-3, ¶ 21) After renewed removal efforts by the Government and Petitioner, in July of 2009, the Russian Consulate indicated that it would only issue a travel document for Petitioner upon his request. Petitioner completed the appropriate forms on July 15, 2009, and those forms were sent to the Russian Consulate that same day. (docket # 30 at 7) Neither the Russian Embassy nor the Russian Consulate, however, has indicated a time frame for issuing a travel document. To date, Vice Consul Dobrinsky has failed to respond to a July 15, 2009 inquiry regarding a time frame for issuing a travel document. (Respondents' Exh. 15, ¶ 9) The Russian Federation Embassy in Washington D.C. has indicated that the facts of this case "place[] an additional burden on the Russian Federation as it seeks to verify Mr. Lawrikow's citizenship" and that doing so will be "difficult and time consuming." (Respondents' Exh. 16, ¶ 10) Specifically, the Russian Federation Embassy explains that,

> The Russian Federation citizenship laws were established on February 6, 1992 and Mr. Lawrikow departed the former USSR before this date. Having departed prior to the formation of the Russian Federation makes verification of citizenship *difficult and time consuming*. It is not the former USSR passport or former USSR birth certificate which confirms current Russian Federation citizenship, rather it is the date and time of the subject's location when the Russian Federation citizenship laws were established. This places an additional burden on all the Russian Federation as it seeks to verify Mr. Lawrikow's citizenship.

(Respondents' Exh. 16, ¶ 10) (emphasis added).

Petitioner has provided evidence in support of the Embassy's statement regarding verifying citizenship. (docket # 17, attachment - information from www.multiplecitizenship.com) Petitioner was admitted to the United States on a passport issued by the United Soviet Socialist Republic ("USSR") in 1991. (Respondent's Exh. 1) After Petitioner's arrival in the United States, in December of 1991, the Soviet Union dissolved into fifteen separate countries. www.coldwar.org. The Russian Federation adopted the Law on Citizenship on February 6, 1992, which remains in effect. *Citizenship Law of the Word*, United States Office of Personnel Management, www.opm.gov. Pursuant to that law, former citizens of the USSR can only become Russian citizens if: (a) they resided in a territory of the Russian federation after February 6, 1992, and (b) if they declared their intention to acquire citizenship of the Russian Federation by December 31, 2000. (*Id.*) It is undisputed that Petitioner does not satisfy these requirements.

As previously stated, even excluding several months for Petitioner's assumed lack of cooperation, the period of Petitioner's post-removal-period detention is well over two times longer than the six-month period presumed reasonable in *Zadvydas*. Thus, the "reasonably foreseeable future" must be near. *See Shefqet v. Ashcroft*, No. 02 C 7737, 2003 WL 1964290, * 4 (N.D. Ill., April 28, 2003) (granting habeas relief when post-removal-order detention exceeded 17 months) (citing *Zhou v. Farquharson*, 2001 U.S. Dist. Lexis 18239, at * 3-4 (D. Mass. Oct. 19, 2001) (granting habeas relief when post-final-order detention period was 13 months)).

The Government and Petitioner resumed efforts to obtain travel documents in May of 2009. And, at this point, Petitioner and the Government have provided the Russian Consulate with the documents requested to obtain a travel document for Petitioner. The travel document request has been pending since June 2, 2009 and was supplemented on July 15, 2009, at the request of the Russian Consulate. The Russian Consulate, however, has not even responded to an inquiry regarding an estimated time frame for issuing a

travel document for Petitioner. The record contains "good reason to believe" that a travel document will not be issued in the reasonably foreseeable future. Far from suggesting that a travel document will be issued in the reasonably foreseeable future, the Russian Federation Embassy has expressed that verifying Petitioner's citizenship will by "difficult and time consuming." (docket # 30, Exh. 16 ¶ 10) On the facts of this case, Petitioner has established good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future. Had Petitioner's detention only just begun, the Court may reach a different conclusion. But, as the Supreme Court has stated, as the length of detention grows, the reasonably foreseeable future becomes closer. Petitioner need not show that his removal is impossible in order to be entitled to relief. *Zadvydas*, 533 U.S. at 702.

Because Petitioner has established good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the burden shifts to Respondent to rebut that showing. *Zadvydas*, 533 U.S. at 701.

As discussed above, Respondent argues that Petitioner is not entitled to relief, because he has failed to cooperate with officials to secure travel documents. As the Court previously discussed, the record at most suggests that Petitioner did not cooperate from October of 2008 to December 2, 2008 when he prepared an affidavit stating that he was willing to return to Russia. Otherwise, Petitioner has cooperated with past removal efforts and Respondent does not argue that Petitioner has failed to cooperate with renewed removal efforts that commenced in May of 2009. Thus, even assuming that Petitioner did not cooperate for several months, this brief period of lack of cooperation has not caused his lengthy detention.

Respondent also argues that Petitioner's removal will likely occur in the reasonably foreseeable future because a travel document request has been pending since June 2, 2009, and was recently supplemented on July 15, 2009. Respondent, however, does not provide any evidence to support its optimism regarding the issuance of a travel

document.  Respondent's own evidence indicates that the Russian Consulate has not provided any time frame for issuing a travel document, and that, as late as July 15, 2009, the Russian Federation Embassy indicated that verifying Petitioner's citizenship will be difficult and time consuming.  The record does not support Respondent's assertion that a travel document will be issued in the reasonably foreseeable future.  Rather, the record indicates that, even assuming a travel document will eventually be issued, it will only be after completion of the "time consuming" process of verifying Petitioner's citizenship and maybe after an interview like the ones conducted in October of 2008.  On the facts of this case, the Court finds that, although there may exist some possibility that Petitioner may be removed, his post-removal-period detention has been sufficiently long, over 12 months, that an unsubstantiated possibility does not satisfy Respondent's burden. *Mohamed v. Ashcroft*, 2002 WL 32620339, at * 1 (W.D.Wash., April 15, 2002) (holding that government did not meet its burden under *Zadvydas* because it provided no evidence regarding how or when it expected to obtain travel documents).  The Ninth Circuit has recognized the breadth of *Zadvydas*' ban against continued and potentially indefinite detentions.  *See Xi v. INS*, 298 F.3d 832, 836 (9th Cir. 2002) (stating that "[t]he Supreme Court's unqualified holding provides that [§ 1231(a)(6)] 'does not permit indefinite detention.'").  Because Petitioner's removal is not reasonably foreseeable, his continued post-removal-period federal detention is not authorized by 8 U.S.C. § 1231(a)(6) and he is entitled to relief.  The Government, however, may still subject Petitioner to supervision with conditions after he is released from detention.  *See Zadvydas*, 533 U.S. at 695.

**III.  Conclusion**

Petitioner has been detained well beyond the six-month presumptive period.  He has shown that there is good reason to believe that there is no significant likelihood of his removal in the reasonably foreseeable future.  Respondent has not rebutted this showing with sufficient evidence.  *Zadvydas*, 533 U.S. at 696.

Accordingly,

**IT IS HEREBY ORDERED** that the May 15, 2009 Report and Recommendation, docket # 18, is **VACATED**.

**IT IS HEREBY RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus (docket # 1) be **GRANTED** and Petitioner be released on appropriate conditions.

**IT IS FURTHER RECOMMENDED** that Petitioner's Motion for Preliminary Injunction (docket # 28) be **DENIED** as moot.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See,* 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(e), Federal Rules of Civil Procedure. Thereafter, the parties have ten days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna- Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See*, Rule 72, Federal Rules of Civil Procedure.

DATED this 27th day of July, 2009.


_____
Lawrence O. Anderson
United States Magistrate Judge